Elliot Gale (Bar #1119904)
egale@gajplaw.com
Gale, Angelo, Johnson, & Pruett, P.C.
1430 Blue Oaks Blvd., Ste. 250
Roseville, CA 95747
916-290-7778 ph
916-721-2767 fax

Attorneys for Plaintiffs
Thomas and Jennifer Wachholtz

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| Thomas and Jennifer Wachholtz <br><br> Plaintiffs, <br><br> v. <br><br> Experian Information Solutions, Inc.; <br> Equifax Information Services, LLC; <br> Flagstar Bank FSB; Cenlar FSB <br><br> Defendants. | CASE NO.  2:21-CV-01025 <br><br> COMPLAINT FOR DAMAGES: <br><br> 1.  Violation of Fair Credit Reporting Act |

COMES NOW Plaintiffs Thomas and Jennifer Wachholtz, individuals, based on information and belief, to allege as follows:

**INTRODUCTION**

1. This case arises under the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b), 15 U.S.C. § 1681e(b), 15 U.S.C. § 1681i(a)(2)(A)), 15 U.S.C. § 1681i(a)(4)), and 15 U.S.C. §1681i(a)(5)(A)).

2. Plaintiffs seek redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of

1

Plaintiffs' mortgage accounts with Flagstar Bank (hereinafter "Flagstar") and Cenlar FSB (hereinafter "Cenlar").

3. Here, Flagstar continues to report inaccurate and incomplete information regarding Plaintiffs' mortgage account.

4. Flagstar's reporting of the account is wholly incomplete and misleading. Specifically, Flagstar continues to report the account involved in an active bankruptcy despite Plaintiff not being in bankruptcy and the account at issue not subject to any bankruptcy discharge.

5. To the extent Plaintiff's account was transferred, Flagstar did not report who it sold or transferred the mortgage account to, despite being required to list that information.

6. Similarly, Cenlar continues to report two mortgage accounts as closed and included/discharged in bankruptcy rather than open and current.

7. Such reporting is misleading and adversely impacts Plaintiff's credit worthiness.

8. Plaintiffs' credit reports have been disseminated to third parties since the completion of their Chapter 13 bankruptcy.

9. Plaintiffs' credit has also been damaged as a result of the inaccurate and misleading reporting.

10. The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system.

11. Creditors know that by deviating from recognized credit reporting standards consumers will have difficulty raising their credit scores and improving their credit worthiness

## **JURISDICTION & VENUE**

12. Plaintiffs re-allege and incorporates herein by reference the allegations in each and every paragraph above, fully set forth herein.

13. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and 1367, and 15 U.S.C. § 1681

2

14. This venue is proper pursuant to 28 U.S.C. §1391(b)(1).

## GENERAL ALLEGATIONS

15. Plaintiffs allege that each and every Defendant is familiar with credit reporting industry standards and subscribes thereto.

16. Plaintiffs allege that Flagstar and Cenlar both received notice of Plaintiffs' chapter 13 filing, or had reason to know about the filing and its treatment under Plaintiffs' chapter 13 plan.

17. Plaintiffs allege that each and every Defendant understands that deviation from credit reporting industry standards can and often does result in denial of credit, higher interest rates, and prompts those making credit decisions to draw a more negative inference from the reported data than if the Defendant reported in accordance with the recognized industry standard.

18. Plaintiffs allege that all actions alleged herein by Defendants were done knowingly, intentionally, and in reckless disregard for credit reporting industry standards in an attempt to purposefully undermine Plaintiffs' attempts to improve their FICO Score.

19. In the alternative Plaintiffs allege that each and every Defendants' actions were the result of reckless policies and procedures that inevitably led to inaccurate, misleading, or incomplete credit reporting.

### FICO, Inc.

20. FICO is a leading analytics software company with its principal headquarters located in San Jose California. FICO has over 130 patents related to their analytics and decision management technology, and regularly uses mathematical algorithms to predict consumer behavior including credit risk.

21. The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent of lending decisions.

22. A FICO score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

23. Base FICO Scores range from 300 to 850, while industry-specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

24. Different lenders use different versions of FICO Scores when evaluating a consumer's credit worthiness.

25. There are 28 FICO Scores that are commonly used by lenders.

26. A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies (CRAs).

27. The three largest CRAs are Experian Information Solutions, Inc.; Equifax, Inc. and Transunion, LLC.

28. FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models or algorithms are based on the premise that information provided by the CRAs is accurate and complies with credit reporting industry standards.

29. There are five key factors that a FICO Score considers: 1) Payment History, 2) Amount of Debt, 3) Length of Credit History 4) New Credit and 5) Credit Mix.

30. Each of the five factors is weighted differently by FICO.

31. 35% of a consumer's FICO Score relates to payment history, 30% relates to the amount of debt, 15% relates to the length of credit history, 10% relates to new credit, and the last 10% relates to a consumer's credit mix or the different types of debts reported.

32. Payment history refers to whether a consumer has paid their bills in the past, on time, late or missed payments. The more severe, recent, and frequent the late payment information, the greater the impact on a FICO Score. Public record items such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

33. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

4

34. Once a delinquent account has been remedied the longer the account stays current the more a consumer's FICO Score should increase.

35. FICO Scores are entirely dependent upon information provided by data furnishers (DFs) to CRAs.

## e-OSCAR

36. E-OSCAR is the web-based Metro 2 compliant system developed by Experian Information Solutions, Inc.; Equifax Information Services, LLC; TransUnion, LLC and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

37. When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification (ACDV) via e-Oscar to the DF.

38. The ACDV contains within it Metro 2 codes next to certain data fields associated with a credit file e.g. "Account Type" "07" (07 in Metro 2 refers to a Charge Account).

## Metro 2

39. The Consumer Data Industry Association is an international trade association representing the consumer credit, mortgage reporting, employment and tenant screening and collection service industries.

40. The credit reporting industry has adopted a standard electronic data reporting format called the Metro 2 format. The Metro 2 format was developed by the CDIA in an effort to universally report debts in a particular manner that is understood to be the most accurate way in which to report a debt. Specifically, Metro 2 format was designed to allow reporting of the most accurate and complete information on consumer's credit history.

41. The CDIA's Metro 2 format is the credit reporting industry standard for accurate credit reporting.

42. The credit reporting industry at large depends upon Metro 2 and the CDIA's recommendations for reporting debt accurately.

43. The CDIA is *the* expert on accurate credit reporting. In support of his allegations Plaintiff avers the following:

a. The CDIA offers a FCRA certificate program for all CRAs.

b. The CDIA offers a FCRA awareness program for all CRAs.

c. The CDIA offers a FCRA Certificate program for DFs.

d. The CDIA offers a FCRA awareness program for DFs.

e. The CDIA offers a Metro 2 Learning system to provide detailed instructions on the use of Metro 2 format to ensure understanding of the reporting guidelines for each field of the Metro 2 Format as well as the relationship between multiple fields.

f. The CDIA hosts workshops developed and authorized by Equifax, Experian, Innovis, and Transunion.

g. The CDIA developed a credit reporting resource guide for accurately reporting credit.

44. The CDIA's Metro 2 is accepted by all CRAs.

45. The credit reporting accepted industry standards for reporting Metro 2 accurately are found in the CDIA's credit reporting resource guide (CRRG).

46. The CRRG outlines the industry standards for most accurately reporting debts using Metro 2.

47. The three main credit bureaus helped draft the CRRG.

48. The CRRG is not readily available to the public. It can be purchased online for $229.45.

49. Even if a buyer is ready willing and able to pay for the CRRG, the CDIA will NOT grant access to the guide unless the buyer represents an organization included in the Metro 2 Access Policy.

50. When FICO calculates credit scores the algorithms use Metro 2 information based on industry standards established by the CDIA.

51. The algorithms used by FICO in determining a consumer's credit score are premised on the Metro 2 data received comporting with the CDIA's recommendations for accurate credit reporting.

52. If the Metro 2 data received by FICO deviates from industry standards an inaccurate or incorrect FICO Score results. If the resulting FICO Score is lower a consumer will be considered a higher credit risk resulting in less favorable lending terms.

53. All three major CRAs are members of the CDIA

54. The CDIA is on record that they know, understand, and accept mortgages are generally non-dischargeable under 11 U.S.C. §1328(c)(1) and 11 U.S.C. § 1322(b)(5).

**Consumer Information Indicator**

55. When a consumer files for bankruptcy protection certain credit reporting industry standards exist.

56. Certain Metro 2 data is regularly expected and calculated by FICO when determining a consumer's credit worthiness.

57. The Consumer Information Indicator (CII) is a critical field in the Metro 2 Format that indicates a special condition that applies to a specific consumer.

58. Under Metro 2 the CII must be reported only on the consumer to whom the information applies.

59. It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.

60. In the consumer bankruptcy context CII Metro 2 Code "A" denotes that a petition for Chapter 7 has been filed, is active, but no discharge has been entered.

61. CII Metro 2 Code "D" indicates that a Chapter 13 petition has been filed, is active, but no discharge entered. This is usually translated on a consumer credit report as "Wage Earner Plan" or "WEP" in the "Account Status" portion of a trade line. Such reporting alerts any potential lender that the account is no longer in a collectable status but is being handled by a Chapter 13 trustee.

62. The CII Metro 2 Code "Z" indicates that a bankruptcy petition has been filed but the chapter is undesignated/unknown.

63. The CII Metro 2 Code "E" denotes that a Chapter 7 bankruptcy has been discharged.

64. The CII Metro 2 Code "H" denotes that a Chapter 13 bankruptcy has been discharged.

7

65. The CII Metro 2 Code "Q" is used when a bankruptcy plan is complete and will remove prior bankruptcy codes on the account; the CII Q is used on liabilities that are not discharged in bankruptcy (such as a mortgage).

66. The CII field is a critical field for consumers and directly relates to and impacts a consumer's credit worthiness.

67. Failure to update the CII to a "Q" on a secured non-discharged debt results in it appearing that a consumer, like Plaintiffs, included an account in a bankruptcy proceeding despite not having done so.

68. It also may result (as is the case here) where it appears an account continues to be in an *active* bankruptcy when in fact no bankruptcy case is pending.

69. It also results in the account being calculated as a major derogatory or adverse account despite the fact it was not included or discharged.

70. The result lowers a consumer's credit score and makes a consumer appear much less credit worthy.

**Transferring Accounts**

71. Accounts that appear on a consumer's credit report should tell a story about the history of the account and its ultimate disposition.

72. When creditors improperly transfer accounts, a consumer's account story becomes disorganized, confusing, and in the instant case, results in a consumer being incorrectly labeled as less credit worthy.

73. The CRRG's guidelines for transferring or selling accounts is simple but rarely followed by data furnishers.

74. There are two contemplated ways in which an account can be sold or transferred under the CRRG.

75. The first results in a single trade line that provides all the details of the original account as well as the name and servicer/collector on the transferred account.

76. The second results in two tradelines that contain the account's entire history.

77. The preferred method, and most accurate way in which to report an account is for one single tradeline to be reported with the entire account history contained within that tradeline.

78. The preferred method involves replacing or updating the original tradeline with the new account / servicer information, with the original creditor information listed in the corresponding parts of the overall tradeline.

79. The second contemplated method results in two tradelines with both the original tradeline reporting the account history up until the transfer/sale and the new account/tradeline picking up where the transfer left off.

80. The original creditor must list who the new servicer/owner of the account is and the new creditor must list the original creditor somewhere in the tradeline information.

81. Reporting that way under the second method allows potential lenders to trace the history of the account and allow a complete story of the consumers account to appear on the credit report.

82. The CRRG does not contemplate, suggest, or otherwise imply a hypothetical outside the two methods listed herein.

83. Specifically, the CRRG does not contemplate a situation where accounts are simply transferred without all information being converted into a new account or a second traceable tradeline appearing without any traceable information.

84. The CRRG is clear that parties involved in the transfer or sale of accounts need to communicate to ensure accurate and complete reporting.

**Plaintiffs' Disputes**

85. On May 1, 2021 and May 12, 2021 Plaintiff Jennifer Wachholtz and Thomas Wachholtz, respectively, ordered credit reports from Experian, Equifax, and TransUnion to ensure proper reporting by Plaintiffs' creditors after their Chapter 13 bankruptcy was completed.

86. Plaintiffs noticed various delinquent and adverse trade line on the May 2021 credit reports where both Cenlar and Flagstar were not reporting complete information regarding a mortgage account.

87. Both Cenlar and Flagstar were reporting that the accounts were included/discharged in bankruptcy.

88. In response, Plaintiffs disputed the Flagstar and Cenlar tradelines with Experian, Equifax, and TransUnion via certified mail in June of 2021.

89. Plaintiff's dispute letters specifically put the Defendants on notice that the accounts should not be listed as discharged, included in bankruptcy, and making payments under a wage earner plan as the account was not included, discharged, or subject to a bankruptcy.

90. The dispute letters also indicated that to the extent the accounts were transferred, the information Flagstar and Cenlar were both reporting was incomplete as it did not indicate anything about a transfer or link to any other tradeline on Plaintiffs' credit reports.

91. Plaintiffs are informed and believe that each CRA received Plaintiffs' dispute letters and, in response, sent Plaintiffs' dispute to Flagstar and Cenlar via an ACDV through e-OSCAR.

92. On July 28, 2021 and July 29, 2021, after the statutory time period had elapsed for Plaintiffs to receive a reinvestigation report from the credit Bureaus, Plaintiffs ordered a second set of credit reports from Experian, Equifax, and TransUnion for the sole purpose to ensure Plaintiffs' accounts with Flagstar and Cenlar had in fact been updated.

### Inaccuracy – Flagstar

93. Plaintiffs were frustrated to see that Defendant Flagstar did not properly update the account.

94. Flagstar was still reporting the account as included and/or discharged in bankruptcy despite the account not being included or discharged in Plaintiffs' Chapter 13 bankruptcy.

95. Flagstar's reporting is inaccurate because Plaintiff did not include or seek to discharge their mortgage with Flagstar in their bankruptcy filing.

96. Flagstar's reporting is entirely incomplete, misleading and technically inaccurate.

97. The reporting is incomplete because the report lacks any updates on the account, including reflecting that the account was not discharged and is not still subject to any type of bankruptcy proceeding.

98. Flagstar should have updated the CII to report a "Q" as instructed by the CRRG after Plaintiff completed his chapter 13 plan or at least removed the bankruptcy notations.

99. As it stands it appears that Flagstar continues to report the CII "D" making it appear that Plaintiff continue to be in an active bankruptcy and that the account may or may not be subject to Plaintiff's discharge given that such a discharge has been received.

100. To be clear, it is impossible for accuracy purposes for Flagstar to accurately report a CII "D" post-discharge and after the completion of a Chapter 13 Plan as the CII "D" should only be reported during an active bankruptcy.

101. Plaintiff is no longer in bankruptcy and the account at issue was: 1) not discharged per the CRRG and the bankruptcy code, and 2) not currently in bankruptcy. As a result, Flagstar should know that the CII "D" cannot possibly be accurate.

102. Plaintiff believes that Flagstar received a copy of Plaintiff's dispute and confirmed that the account was included and/or discharged in bankruptcy.

103. In addition, to the extent that Flagstar transferred or sold the account, it failed to list who it sold or transferred the account to on the tradeline.

104. No other tradeline on Plaintiff's credit reports contain any subsequent account information that would allow lenders or anyone else viewing the report to connect the Flagstar account to any subsequent account.

**Willfulness**

105. This was not a negligent act by Defendant Flagstar but instead an intentional act to purposefully undermine Plaintiffs' ability to effectively restore their credit.

106. Flagstar's reporting makes Plaintiffs appear less credit worthy because the lack of any update on the account makes it appear that Plaintiffs sought to discharge and include their mortgage in their Chapter 13 bankruptcy proceeding and that Plaintiffs remain in an active Chapter 13.

107. Flagstar knows that its reporting must be accurate and complete.

108. Flagstar, with knowledge of Plaintiffs' dispute, chose not to update Plaintiff's credit report and instead still reported that the account was subject to a Chapter 13 bankruptcy and otherwise may or may not be discharged.

109. Flagstar updated the tradeline as recently as July 5, 2021.

110. Such a scheme directly undermines the integrity of the credit reporting system at large.

**Inaccuracy – Cenlar**

111. Plaintiffs were frustrated to see that Defendant Cenlar did not properly update the account.

112. Cenlar was still reporting the account as included and/or discharged in bankruptcy despite the account not being included or discharged in Plaintiffs' Chapter 13 bankruptcy.

113. Cenlar's reporting is inaccurate because Plaintiff did not include or seek to discharge their mortgage with Flagstar in their bankruptcy filing.

114. Cenlar's reporting is entirely incomplete, misleading and technically inaccurate.

115. The reporting is incomplete because the report lacks any updates on the account, including reflecting that the account was not discharged and is not still subject to any type of bankruptcy proceeding.

116. Cenlar should have updated the CII to report a "Q" as instructed by the CRRG after Plaintiffs completed their chapter 13 plan or at least removed the bankruptcy notations.

117. As it stands it appears that Cenlar continues to report the CII "D" making it appear that Plaintiffs continue to be in an active bankruptcy and that the account may or may not be subject to Plaintiffs' discharge given that such a discharge has been received.

118. To be clear, it is impossible for accuracy purposes for Cenlar to accurately report a CII "D" post-discharge and after the completion of a Chapter 13 Plan as the CII "D" should only be reported during an active bankruptcy.

119. Plaintiffs are no longer in bankruptcy and the account at issue was: 1) not discharged per the CRRG and the bankruptcy code, and 2) not currently in bankruptcy. As a result, Cenlar should know that the CII "D" cannot possibly be accurate.

120. Plaintiffs believe that Cenlar received a copy of Plaintiff's dispute and confirmed that the account was included and/or discharged in bankruptcy.

121. Cenlar updated the tradeline as recently as July 22, 2021, well after Plaintiffs disputed the account.

122. In addition, to the extent that Cenlar transferred or sold the account, it failed to list who it sold or transferred the account to on the tradeline.

123. No other tradeline on Plaintiff's credit reports contain any subsequent account information that would allow lenders or anyone else viewing the report to connect the Flagstar account to any subsequent account.

### Willfulness

124. This was not a negligent act by Defendant Cenlar but instead an intentional act to purposefully undermine Plaintiffs' ability to effectively restore his credit.

125. Cenlar's reporting makes Plaintiffs appear less credit worthy because the lack of any update on the account makes it appear that Plaintiffs sought to discharge and include their mortgage in their Chapter 13 bankruptcy proceeding and that Plaintiffs remain in an active Chapter 13.

126. Cenlar knows that its reporting must be accurate and complete.

127. Cenlar, with knowledge of Plaintiffs' dispute, chose not to update Plaintiff's credit report and instead still reported that the account was subject to a Chapter 13 bankruptcy and otherwise may or may not be discharged.

128. Such a scheme directly undermines the integrity of the credit reporting system at large.

**Damages**

129. As a result of the incorrect reporting, Plaintiffs have suffered economic loss, diminished credit, and emotional harm.

130. Flagstar and Cenlar's inaccurate reporting have been transmitted to third parties since Plaintiff completed their Chapter 13 case and negatively impacted Plaintiff's ability to obtain and rebuild their credit.

131. Flagstar and Cenlar's reporting have diminished Plaintiff's credit score.

132. The actions of Experian, Equifax, Cenlar, and Flagstar as alleged herein are acts in violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b).

**FIRST CAUSE OF ACTION**
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))
Against Defendants Experian and Equifax)

**Experian Information Solutions, Inc. and Equifax Information Services, LLC – Failure to Assure Credit Reporting Accuracy.**

133. Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

134. Experian and Equifax violated 15 U.S.C. § 1681e(b) by failing to establish and/or to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiffs' credit reports and credit files it published and maintained concerning Plaintiff.

135. Had Experian and Equifax maintained reasonable procedures to assure maximum accuracy Experian and Equifax would never have allowed Defendants Flagstar and Cenlar to report the account as described herein.

136. Flagstar and Cenlar both appear to be reporting a "CII" that refers to an active bankruptcy.

14

137. Experian and Equifax all are reporting that Plaintiffs have completed their bankruptcy and therefore should know that Flagstar and Cenlar's reporting cannot possibly be accurate.

138. Even assuming the CRAs are not sophisticated enough to address this obvious contradiction, Plaintiffs disputed the accounts and the CRAs still did not fix the issue.

139. Plaintiffs informed Experian and Equifax that the information reported by Flagstar and Cenlar was incorrect because Plaintiffs, to the extent the account was transferred, informed the CRAs to the transfer.

140. Instead, the accounts remain unchanged.

141. As a result of Experian and Equifax's violation of 15 U.S.C. § 1681e(b), Plaintiffs suffered actual damages, including but not limited to: diminished credit, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**Willfulness**

142. The violations described herein by Experian and Equifax were willful, specifically the Credit Bureaus have intentionally and purposefully set up a system where inaccuracies are not only probable but inevitable.

143. In 2012 the FTC reported that 1 in 5 consumer credit reports contains a material error.

144. Such a finding should shock the conscience.

145. When those errors are disputed Equifax and Experian intentionally send consumer disputes to employees who do not live within the continental United States.

146. This is intentionally done to hide and or subvert a consumer's ability to confront individual directly responsible for approving accurate reporting.

147. Such a policy also inevitably leads to disputes going unresolved as these employees for Defendants Experian and Equifax receive little to no training concerning how to accurately report consumer debt.

148. Instead, these employees are simply instructed to parrot whatever information a data furnisher provides regardless of whether or not that information is accurate. *See Saez v. Trans Union,* LLC, 621 F.Supp. 2d 1074, 1083, 1088 (D.Or. 2007); *Grigoryan v.*

*Experian Info. Sols*., Inc., 84 F. Supp. 3d 1044, 1091 (C.D. Cal. 2014); *Haykuhi*

*Avetisyan v. Experian Info Sols*., No. CV 14-05276-AB (ASX)

149. Experian and Equifax employees are regularly expected to review and approve over 90 disputes per day rendering less than five minutes to review, investigate, and respond to each dispute received.

150. Experian and Equifax have intentionally setup this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

151. Experian and Equifax also allowed Flagstar and Cenlar to report the account with inaccurate information despite specifically being told in the dispute letter why the information Flagstar and Cenlar were reporting was incorrect.

152. Experian and Equifax are members of the consumer data industry association

153. The consumer data industry association has specifically briefed and AGREED with Plaintiff that the reporting of Flagstar in the present matter is inaccurate. See **Brief for the Consumer Data Industry Association as Amicus Curia in Support of Defendants-Appellees** in *Alan R. Riekki v. Bayview Financial Loan Servicing*, et al., Case No 16-16438 in The United States Court of Appeals for the Ninth Circuit.

154. Despite the CRAs having actual knowledge of Plaintiffs' bankruptcy, Flagstar and Cenlar's reporting the account included in an ongoing bankruptcy, and the bankruptcy actually being closed, Experian and Equifax continue to allow Flagstar and Cenlar to report the account included and discharged in bankruptcy.

155. Not only is Experian and Equifax allowing Flagstar and Cenlar to report in a manner that they know is factually impossible (an account cannot be included in an on-going bankruptcy if the bankruptcy has been closed) but in a manner the CDIA has specifically briefed as inaccurate.

156. As a result, Experian and Equifax are allowing Flagstar and Cenlar to report in a manner they know is factually and legally inaccurate.

157. Consequently, Defendants Experian and Equifax are liable for punitive damages in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n.

158. In the alternative, Experian and Equifax were at least negligent, which entitles Plaintiffs to recovery under 15 U.S.C. § 1681o.

159. Plaintiffs are entitled to recover actual damages, statutory damages, costs and attorney's fees from Experian and Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## SECOND CAUSE OF ACTION
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681s-2(b))
Against All Defendants)

**Flagstar and Cenlar – Failure to Reinvestigate.**

160. Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

161. 15 USC 1681s-2(b) and 15 USC 1681i-(a)1 prohibits furnishers from providing any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate or misleading and requires a furnisher to update and or correct inaccurate information after being notified by a consumer reporting agency of a dispute by a consumer.

162. Defendants Flagstar and Cenlar violated section 1681s-2(b) by failing to conduct a reasonable investigation and re-reporting misleading and inaccurate account information.

163. The CRAs provided notice to Flagstar and Cenlar that Plaintiffs were disputing the inaccurate and misleading information, but Flagstar and Cenlar failed to conduct a reasonable investigation of the information as required by the FCRA.

164. Based on Plaintiffs' disputes, Flagstar and Cenlar both should have known that its reporting was incomplete as Plaintiffs' dispute letters highlighted the problems with the tradeline.

165. The most basic investigation would simply involve reading Plaintiffs' dispute letters.

166. Plaintiffs allege Flagstar and Cenlar did not review well established industry standards for credit reporting.

17

167. If Flagstar and Cenlar had reviewed such standards, Flagstar and Cenlar would have seen its reporting was not in compliance and in accordance with the CRRG and consequently inaccurate and or incomplete.

168. Moreover, had Flagstar and Cenlar done any investigation whatsoever it would have uncovered that its reporting showed an active and discharged bankruptcy when in fact Plaintiffs were not actually in bankruptcy at all.

169. The lack of investigation is unreasonable.

170. Plaintiffs further alleges that Flagstar and Cenlar have not properly trained those directly investigating disputes on Metro 2 generally or credit reporting industry standards and as such have developed reckless policies and procedures.

**Experian Equifax – Failure to Reinvestigate Disputed Information.**

171. Plaintiffs re-allege and incorporates herein the allegations in each and every paragraph above as though fully set forth herein.

172. After Plaintiffs disputed the account mentioned above, Experian and Equifax were required to conduct a reasonable investigation and to delete any information that was not accurate under 15 USC 1681i-(a)1.

173. Experian and Equifax failed to conduct a reasonable investigation and failed to correct the misleading and or inaccurate statements on the account within the statutory time frame or at all.

174. Experian and Equifax could not have possibly done any type of reasonable investigation into this matter as Plaintiffs explicitly explained that the Flagstar and Cenlar accounts were not included or discharged in his bankruptcy and provided information related to the sale of the property.

175. Plaintiffs allege that Experian and Equifax have its own independent duty to conduct a reasonable investigation 15 USC 1681i-(a)1.

176. Experian and Equifax are not passive entities bound to report whatever information a DF provides.

177. Given the aforementioned, Plaintiffs allege that Experian and Equifax can and do suppress inaccurate information from being reported when DFs provide inaccurate information.

178. Experian and Equifax can and do instruct DFs on how to properly report certain accounts from time to time upon request from the DF.

179. Experian and Equifax failed to conduct a reasonable investigation because any basic investigation would have included a review of Plaintiffs' dispute letters.

180. Experian and Equifax therefore did not do the most basic investigation regarding credit reporting industry standards otherwise the aforementioned would have been uncovered.

181. Experian and Equifax intentionally, willfully or with reckless disregard for Plaintiffs' accuracy did no investigation whatsoever given that Experian and Equifax's general policy is to simply parrot whatever information a data furnisher sends.

182. Such policies and procedures inherently lead to inaccurate information being reported and therefore such an investigation is wholly unreasonably and reckless i.e. willful.

**THIRD CAUSE OF ACTION**
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4)
Against Defendants Experian and Equifax)

**Experian and Equifax – Failure to Review and Consider All Relevant Information.**

183. Plaintiffs reallege and incorporate herein the allegation in each and every paragraph above as though fully set forth herein.

184. Experian and Equifax violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiffs.

185. As a result of Experian and Equifax's violation of 15 U.S.C. § 1681i(a)(4), Plaintiffs suffered actual damages, including but not limited to, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

186. The violations by Experian and Equifax were willful, rendering each of the Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

187. In the alternative Experian and Equifax were negligent, which entitle Plaintiff to recovery under 15 U.S.C. § 1681o.

188. Plaintiffs are entitled to recover actual damages, statutory damages, costs and attorney's fees from Experian and Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## FOURTH CAUSE OF ACTION
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))
Against Defendants Experian and Equifax)

**Experian and Equifax– Failure to Delete Disputed and Inaccurate Information.**

189. Plaintiffs re-allege and incorporate herein the allegation in each and every paragraph above as though fully set forth herein.

190. Experian and Equifax violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiffs' credit file or modify the item of information upon a lawful reinvestigation.

191. As a result of Experian and Equifax's violation of 15 U.S.C. § 1681i(a)(5)(A), Plaintiff suffered actual damages, including but not limited to, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

192. The violations by Experian and Equifax were willful, rendering each of the Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

193. In the alternative, Experian and Equifax were negligent, which entitle Plaintiffs to recovery under 15 U.S.C. § 1681o.

194. Plaintiffs are entitled to recover actual damages, statutory damages, costs and attorney's fees from Experian and Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

Wherefore, Plaintiffs pray for judgment as hereinafter set forth.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

1. For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;

2. Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;

3. Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;

4. Award attorney's fees and costs of suit incurred herein pursuant to 15 U.S.C. § 1681n & o;

5. For determination by the Court that Creditor's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, et seq.; and

6. For determination by the Court that Creditor's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

**Gale, Angelo, Johnson, & Pruett, P.C.**

Dated: September 2, 2021                 */s/ Elliot Gale*
                                        Elliot Gale
                                        Attorney for Plaintiffs

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial of this matter by jury.

**Gale, Angelo, Johnson, & Pruett, P.C.**

Dated: September 2, 2021                 */s/ Elliot Gale*
                                        Elliot Gale
                                        Attorney for Plaintiffs